# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Tyrus J. Clark, Respondent,

v.

Amika T. Clark, Appellant.

Appellate Case No. 2021-001169

---

Appeal From Greenville County
Rochelle Y. Conits, Family Court Judge

---

Opinion No. Op. 6103
Submitted October 1, 2024 – Filed March 5, 2025

---

## AFFIRMED

---

Gregory Samuel Forman, of Gregory S. Forman, PC, of
Charleston, Liza Marie Deever, of Deever Law, LLC, of
Fountain Inn, both for Appellant.

Gwendolynn Wamble Barrett, of Barrett Mackenzie,
LLC, of Greenville, for Respondent.

---

**THOMAS, J.:** This appeal arises from an order of the family court awarding Tyrus Clark (Father) attorney's fees, amending the Final Order and Divorce Decree, denying Amika Clark's (Mother's) Motion to Reconsider the Order of Contempt, and denying Mother's motion for attorney's fees. Mother argues the family court erred in: (1) finding Mother in contempt for "making derogatory comments about the other [parent] in any manner whereby the child might learn of same, keeping the child in a moral and safe environment, conduct detrimental to

the child, and allowing the child access to age inappropriate material," for publishing a book depicting the parties' marriage and divorce, (2) precluding Father's eighteen-year-old daughter from testifying, and (3) finding Mother in contempt for violating a restraining order that violates Mother's right to free speech. Mother also argues if this court reverses the contempt finding against her, this court should reverse the award of attorney's fees to Father and either award Mother her fees for defending this contempt petition or remand the matter to the family court. We affirm.

**FACTS**

Mother and Father were divorced in 2015 after a contested three-day trial.[1] During their marriage, the parties had one child, Minor Child, in 2009. The Final Order and Decree of Divorce (the Final Divorce Order) found exceptional circumstances and granted the parties joint custody of Minor Child, with each parent having equal time. The Final Divorce Order also placed various restrictions and restraints on parental conduct as it pertained to the parents' conduct around Minor Child. Section 7, Paragraph C of the Final Divorce Order (the disparagement provision) read, "All parties are restrained against the use of profanity or making any derogatory comments about or toward the other party, or allowing anyone else to do so in front of the child, in any manner whereby the child might learn of the same."

Mother appealed the family court's decision as to custody and visitation and sought sole custody of Minor Child. In 2017, while the appeal was pending, both parties filed Contempt Complaints against one another, resulting in a Final Order on Contempt Actions in March 2017. This court affirmed the family court's shared custody determination. *Clark v. Clark*, 423 S.C. 596, 815 S.E.2d 772 (Ct. App. 2018).

Several months later, on April 27, 2019, Mother published a book (The Book) depicting the circumstances surrounding the parties' marriage and divorce, as well as other aspects of Mother's life; and it has been published, marketed, and sold by national book retailers. The cover of The Book contains a photograph of Mother, made up of puzzle pieces, with a black eye drawn with makeup. Included in The

---

[1] At the commencement of filing for divorce, both parties alleged physical abuse by the other party. In the Final Divorce Order, Judge Phillips found neither party met the burden of proof necessary for a fault-based divorce on the ground of physical abuse. Instead, the family court granted Father's request for a no-fault divorce based on the ground of the parties' continuous separation for one year.

Book are allegations by Mother claiming physical, mental, emotional, and sexual abuse at the hands of Father.

In addition to national book retailers, Mother promotes The Book on her personal website. Mother also testified she was an ambassador at a private 501(c)(3) non-profit that offers services to survivors of domestic abuse. Mother promotes her book through the non-profit and local speaking engagements. Mother and Minor Child are pictured on Mother's website, along with promotions for The Book and a book authored by Minor Child published on December 19, 2019.[2] The "About" tab on Mother's website reads, in part, "As a mother of a young daughter, Amika wants to change the narrative and cycle for her daughter and give a voice to personal, internal thoughts."

On March 30, 2020, Father filed a Contempt Complaint alleging Mother violated multiple restraining orders in the Final Divorce Order, including the disparagement provision, by writing and publishing The Book. At the hearing on the motion, when asked about the specific allegations made in The Book, Mother testified the contents of The Book were truthful and accurate descriptions of the emotional, physical, and mental abuse she suffered at the hands of Father.[3] She admitted to writing Father was "full of bullshit and lies" during the marriage. Mother further admitted that she accused Father of being mentally ill. Mother was asked about a portion of The Book in which she discusses an affidavit she wrote for an expedited hearing. Father's counsel asked Mother to confirm she wrote: "My shield became impossible when her father screamed expletives and belligerent names at me during story time which she witnessed her father follow me from room to room berating me no matter how much I tried to remove myself from the situation. Mother's bond is unwaveable [sic]. . . . She hears her dad yelling and screaming at me, she comes to what she calls 'mommy's rescue.'" Mother also testified to a poem she wrote entitled "Little Dick Mother" which was "a poem written out of

_____

[2] Minor Child's book is marketed and sold on Mother's website. The website contains a tab labeled "About [Minor Child]" which provides a brief biography and photograph of Minor Child.
[3] Both parties cited physical abuse during the divorce proceedings. However, in the Final Divorce Order, after considering witness testimony and the existence of 9-1-1 call logs, the family court noted "[Mother] called the police to the residence numerous times during the marriage; however, [Father] was never charged with a crime. [Father] called the police to the residence in March of 2014 which resulted in [Mother] being charged with criminal domestic violence. That charge remains pending."

anger . . . givin' an analogy to someone being lower than a snake's belly . . . and it is comparing them to . . . their inability to satisfy me sexually . . . it's basically saying . . . that I'm tired and I'm movin' on." Mother also admitted to writing in The Book that Father is a "narcissistic, irrational, manipulative liar." When asked if she was aware she was prohibited from making disparaging comments about Father, Mother responded, "I haven't made disparaging comments to where [Minor Child] would know about it." Despite the admitted testimony, Mother further testified she had taken precautions so that Minor Child would not have access to The Book.

At the hearing, Mother sought to introduce testimony from Father's eighteen-year-old daughter (MCC) from a previous relationship. MCC lived in Arizona, and did not have a relationship with Father. When asked why Mother wanted to present MCC's testimony, counsel argued MCC would testify that she had never seen The Book, and The Book had no bearing on MCC's mother's filing an Order of Protection against Father on MCC's behalf. Counsel went on to argue:

> The reason for calling the daughter is Mr. Clark's given
> extensive testimony about how this book is going to have
> a terrible effect on his, on his daughters and they're, uh,
> they're gonna grow up to be drug addicts and everything
> else, I want this court to understand that his daughters
> and their relationship and how they turn out has to do
> with his behavior, not with a book that they have no
> knowledge of.

MCC's mother, Marita Collier, was allowed to testify regarding her and MCC's past and relationship with Father. The court precluded MCC's testimony based on relevance and stated, "MCC's proposed testimony . . . is not going to change what's before me about whether or not your client is in contempt."

At the close of the contempt hearing, the family court requested that each party brief the First Amendment issue that came up during Mother's testimony at the hearing. Both parties complied.

On March 17, 2021, the family court issued its Order on Contempt. The family court found, *inter alia*, The Book violated various provisions of the parties' prior orders, including provisions against making derogatory comments about the other in any manner whereby Minor Child might learn of same, keeping Minor Child in a moral and safe environment, conduct detrimental to Minor Child, and allowing Minor Child access to age inappropriate material, and held Mother in criminal and

civil contempt.  The family court ordered Mother to cease and desist from selling and disseminating The Book in any manner whatsoever and placed other restrictions on Mother's use and handling of the material associated with The Book. The family court sanctioned Mother by sentencing her to jail, suspended upon her removal of The Book from the open market among other requirements, ordering her to pay fines totaling $3,500.00, and ordering her to pay attorney's fees and costs of $10,000.00 within ninety days of the order.  In addressing the First Amendment issue raised by Mother at trial, the family court's order held:

> Under the First Amendment, this court may regulate the content of constitutionally protected speech in order to promote a compelling state interest as long as it chooses the least restrictive means to further that interest, and the Court finds that the current disparagement clause meets that test.  The court finds that if Mother's disparaging and damag[ing] speech in the form of her book is left unchecked and unfettered, as it has been since April 27, 2019 due to her egregious violation of this court's order in writing and publishing this book, the harm to the minor child is imminent and severe, and this court has a compelling state interest in limiting Mother's speech in the best interests of this child.  This child is in counseling, suffering from anxiety, which Mother indicates is due to anxiety over divorce issues.  Mother's actions have proven, unequivocally, that without court interference, she would continue to promote her book[,] which would be detrimental to the emotional and psychological welfare of this minor child.  The court finds that Mother's book is not constitutionally protected free speech.

Mother filed a Notice of Motion and Motion to Reconsider Order on Contempt on March 31, 2021.  A hearing on the motions was held on August 12, 2021, and the family court issued its Final Order on Contempt Actions on August 27, 2021.  The family court awarded Father $5,000 in attorney's fees for having to brief the constitutional issue, and an additional $2,433.75 in attorney's fees for his motion to reconsider.  The family court further amended the parties' prior disparagement provision to read:

> All parties are restrained against the use of profanity or making any derogatory comments about or toward the

other party or allowing anyone to do so in front of the child/children, or in any manner whereby the child might learn of the same, except where there exists a reasonable expectation of privacy whereby the child reasonably would not, could not, or should not learn of the same.

This appeal followed.

## STANDARD OF REVIEW

"On appeal from the family court, the appellate court reviews factual and legal issues de novo." *Klein v. Barrett*, 427 S.C. 74, 79, 828 S.E.2d 773, 776 (Ct. App. 2019). Despite this standard of review, we are mindful that the family court, which saw and heard the witnesses, was in a better position to evaluate the credibility of the witnesses and assign comparative weight to their testimony. *Lewis v. Lewis*, 392 S.C. 381, 385, 709 S.E.2d 650, 651-52 (2011). The appellant has the burden of showing this court the greater weight of the evidence is against the family court's findings. *Id.* at 392, 709 S.E.2d at 655. "Stated differently, [de novo] review neither relieves an appellant of demonstrating error nor requires us to ignore the findings of the family court." *Id.* at 388-89, 709 S.E.2d at 654. Appellate courts review the family court's evidentiary or procedural rulings using an abuse of discretion standard. *Stoney v. Stoney*, 422 S.C. 593, 594 n.2, 813 S.E.2d 486, 486 n.2 (2018).

## LAW/ANALYSIS

### A.     Finding of Contempt Based on The Book

Mother argues the family court erred in finding Mother in contempt despite the lack of evidence Minor Child had even been exposed to The Book. We disagree.

A party is guilty of contempt when he willfully disobeys a court order. *Burns v. Burns*, 323 S.C. 45, 48, 448 S.E.2d 571, 572 (Ct. App. 1994). "A finding of contempt is within the discretion of the trial court and will not be disturbed on appeal unless it is without evidentiary support." *Id.* at 48, 448 S.E.2d at 572-73. "A willful act is one 'done voluntarily and intentionally with the specific intent . . . to fail to do something the law requires to be done . . . .'" *Spartanburg Cnty. Dep't of Soc. Servs. v. Padgett*, 296 S.C. 79, 82-83, 370 S.E.2d 872, 874 (1988) (quoting *Black's Law Dictionary* 1434 (5th Ed. 1979)). A finding of contempt, therefore, must be reflected in a record that is "clear and specific as to the acts or conduct upon which such finding is based." *Curlee v. Howle*, 277 S.C. 377, 382, 287

S.E.2d 915, 918 (1982). "Contempt is an extreme measure; this power vested in a court is not lightly asserted." *Bigham v. Bigham*, 264 S.C. 101, 104, 212 S.E.2d 594, 596 (1975). "Prior to invoking this power, the court must necessarily consider the ability of the defendant to comply with the order." *Id.*

Mother argues the finding of contempt based on the disparagement provision of the Final Divorce Order was erroneous because there was no evidence that Minor Child knew of or read The Book. Mother asserts The Book was just a "personal diary of sorts" and there was no evidence Mother ever discussed or exposed Minor Child to The Book. Mother also argues there is no plausible way to know for certain when and how Minor Child "might learn of" The Book or any disparaging comments made towards Father. However, we find Minor Child's knowledge of The Book or its contents is not a factor important to the analysis of Mother's contempt. *See Abate v. Abate*, 377 S.C. 548, 553, 660 S.E.2d 515, 518 (Ct. App. 2008) (finding a party seeking a contempt finding for violation of a court order must show the order's existence and facts establishing the other party did not comply with the order).

Here, we find there was ample evidence to support the court's finding of contempt. The final contempt order in this case is thirty-five pages long. It explained the family court judge reviewed all of the exhibits, considered the testimony, and considered witness credibility. The order also summarizes and explains the rulings on each issue. Mother does not deny writing or publishing The Book. Nor does she deny that The Book was based on her own personal experiences. Further, Mother does not argue that The Book is not a violation of the disparagement provision. Instead, she raises, for the first time at trial, that the disparagement provision is a prior restraint on her free speech that is not narrowly tailored to meet a compelling state interest and is therefore unconstitutional.[4] In its contempt order, the family court cited to Mother and Minor Child both being pictured on Mother's website, both promoting their respective books on Mother's website, the fact that the mother of Father's older daughter has a copy of The Book and speaks to Minor Child regularly, and the public promotion and sale of The Book online, to account for its finding of contempt in Mother's publishing of The Book. We find the prohibition of "making derogatory comments about the other in any manner whereby the child might learn of same" was clearly violated by Mother; thus, the family court did not err in finding her in contempt; accordingly, we affirm.

---

[4] This section will first address just the family court's finding of contempt. Section C addresses Mother's First Amendment argument in full.

**B.    Testimony of Father's Eighteen-Year-Old Daughter**

Mother argues the family court abused its discretion in precluding MCC from testifying, particularly when the family court based its contempt finding on what MCC may have told Minor Child.  We disagree.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 401, SCRE.  "Evidence which is not relevant is not admissible."  Rule 402, SCRE.  Resolving questions of credibility is the function of the family court judge who heard the witnesses' testimony.  *Terwilliger v. Terwilliger,* 298 S.C. 144, 147, 378 S.E.2d 609, 611 (Ct. App. 1989).  "Because the appellate court lacks the opportunity for direct observation of witnesses, it should accord great deference to the [family] court findings when matters of credibility are involved."  *Shirley v. Shirley,* 342 S.C. 324, 329, 536 S.E.2d 427, 429 (Ct. App. 2000).  "This is especially true in cases involving the welfare and best interests of children."  *Aiken County Dep't. of Soc. Servs. v. Wilcox,* 304 S.C. 90, 93, 403 S.E.2d 142, 144 (Ct. App. 1991).

At the contempt hearing, the family court precluded MCC from testifying because the court found her testimony was not relevant.  The court properly found MCC's testimony would not make the finding of Mother's contempt more or less probable.  MCC's potential testimony regarding whether she read The Book, or whether she discussed The Book with Minor Child, had no bearing on Mother's willful contempt of the court.  MCC's testimony was not relevant or necessary to establish Mother wrote The Book as Mother previously admitted to writing The Book.  Similarly, MCC's testimony was not required to establish what was in The Book as The Book itself was in evidence.  Further, the court allowed MCC's mother to testify regarding her relationship with Father, her own allegations of domestic violence, and the Order of Protection she filed in Arizona.  Although MCC was eighteen at the time of the hearing, the court considered MCC's age and relationship with her father when it stated, "I'm not puttin' that 18-year-old on the stand about her father, I'm not gonna do that."[5]

---

[5] Rule 23(b) of the South Carolina Family Court Rules states that children should not be offered as witnesses as to the misconduct of either parent, except, when, in the discretion of the court, it is essential to establish the facts alleged.

In this case, MCC's testimony was not essential to establish Mother's willful contempt, which we believe was sufficiently evidenced in the remainder of the record. We find the court properly excluded the testimony of MCC.

## C.      Finding of Contempt and Mother's Free Speech

Mother argues the family court violated her First Amendment right to free speech by finding her in contempt. We disagree.

The First Amendment commands, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. However, the government may regulate the content of constitutionally protected speech in order to promote a compelling interest as long as it chooses the least restrictive means to further that interest. *Sable Commc'ns of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989). In this case, we agree with the family court that the best interests of Minor Child are a sufficient compelling interest to warrant restricting Mother's speech; thus, there was no violation of Mother's rights under the First Amendment.

South Carolina courts have long held that "[i]n making a custody determination, the child's welfare and best interest are the paramount and controlling considerations of the court." *Lewis*, 400 S.C. at 364, 734 S.E.2d at 327. In making an award of custody, there are several factors that the family court must consider when determining what is in the best interest of the child. *See* S.C. Code Ann.§ 63-15-240 (B). Inherent in several of those factors is a requirement of judicial consideration of parents' behavior, which includes speech, as being relevant to the child's best interest. § 63-15-240 (B)(6)-(8). The family court must also consider whether there has been domestic violence involved. Furthermore, it must consider any effort by one parent to disparage the other in front of the child as a factor in awarding custody. § 63-15-240 (B)(8). We believe it would be inconsistent for the family court to find that parents have a First Amendment right to make disparaging comments about the other parent to the child, or in a manner in which the child might learn of same, when it would not be in the child's best interest.

Mother raised, for the first time at trial, that the disparagement provision is a content and viewpoint based prior restraint on her free speech that is not narrowly tailored to meet a compelling state interest and is therefore unconstitutional.[6]

---

[6] The contempt order notes Mother did not appeal the constitutionality of the disparagement provision's restriction on speech when it was written into the Final Divorce Order. In fact, Mother never raised this defense until she testified at the second half of the contempt hearing on January 6, 2021. Even then, the court

Specifically, she claims the disparagement provision "prohibits 'making any derogatory comments about or toward the other party' but does not prohibit the same character of comments about or toward any other person, including the child, or praise concerning any party or the child." Because the disparagement provision only applies to speech deemed to be derogatory, Mother argues it is a content-based restriction that may only withstand challenge to its constitutionality based upon a showing that the restriction is "necessitated" by a compelling government interest that is narrowly tailored to serve that interest. Mother raises issues of overbreadth and vagueness within the disparagement provision and argues it was not narrowly tailored enough to withstand a constitutional challenge. However, the family court seemingly took this into account when it amended the original disparagement provision after contempt findings against Mother. The family court amended the order from reading, "All parties are restrained against the use of profanity or making any derogatory comments about or toward the other party, or allowing anyone else to do so in front of the child, in any manner whereby the child might learn of the same," to:

> All parties are restrained against the use of profanity or making any derogatory comments about or toward the other party or allowing anyone to do so in front of the child/children, or in any manner whereby the child might learn of the same, **except where there exists a reasonable expectation of privacy whereby the child reasonably would not, could not, or should not learn of the same.** (emphasis added).

The family court, in amending the disparagement provision, allowed for specific instances of disparaging comments to be made by Mother so long as she had a reasonable expectation of privacy at the time. According to the rewritten disparagement provision, Mother has available forums for disparaging Father.

While South Carolina courts have not ruled on the issue of the constitutionality of prior restrictions on parental speech, courts in some jurisdictions have held that the

---

notes, Mother did not attempt to defend her actions in writing and publishing the disparaging book, she simply raised a constitutional defense against the provision as a whole. Accordingly, the court found Mother wrote and published The Book knowing fully that it was a violation of the disparagement provision in the Final Divorce Order.

state's interest in protecting the best interests of a child is a compelling interest that can justify limiting a parent's constitutional right to free speech. *See, e.g., Borra v. Borra*, 756 A.2d 647, 650 (N.J. Super. 2000) (finding an injunction against a father's efforts to contest a mother's application for country club membership was proper in light of the state's *parens patriae* interest in the welfare of the children, which was threatened by the parents' conflict over the membership; although the father had a First Amendment right to speak his mind freely, "New Jersey courts have consistently recognized that the 'best interests' of the children can be made paramount to other fundamental rights").

The Massachusetts Supreme Judicial Court recently addressed the issue of parental speech and prior restraints in *Shak v. Shak*.[7]  In that case, there was an order prohibiting both parents from posting disparaging remarks about each other and the ongoing litigation on social media.  The Massachusetts court ruled that an order preventing a parent from posting about his child on social media violated the father's constitutional right to freedom of speech.  The court in *Shak* held the State had a compelling interest in protecting children from exposure to disparaging remarks from the parents but that more was required to justify such a significant burden on free speech.  We find *Shak* is distinguishable.  First, the child in *Shak* was a toddler, while Minor Child is a sophisticated eleven-year-old who has written and published a book of her own.  The court in *Shak* noted, "[a]s a toddler, the child is too young to be able either to read or to access social media."  144 N.E.3d at 280.  Here, Minor Child is capable of accessing the Internet and is able to Google her own name, which inevitably leads to Mother's website promoting The Book.  The family court further found Minor Child's mental, physical, and emotional wellbeing is unstable as evidenced by Mother taking her to counseling.  The court reasoned this makes Minor Child even more vulnerable to the grave harm she would experience as a result of reading The Book.

The Kentucky Court of Appeals addressed prior restraints on parental speech in *Wedding v. Harmon*.[8]  There, the father appealed an order of the Jefferson Family Court granting the mother's motion to prohibit the father from harassing her by copying and forwarding routine co-parenting emails to individuals within the parties' local community and from sending mass emails to the parties' friends, family and other members of their community regarding the parties' dissolution, custody proceedings and co-parenting.  The father's sole contention on appeal was that the order was an unconstitutional infringement on his speech.  492 S.W.3d at

---

[7] 144 N.E.3d 274 (Mass. 2020).
[8] 492 S.W.3d 150 (Ky. Ct. App. 2016), *as modified* (Apr. 22, 2016).

151.  The Kentucky court affirmed the order of the family court because: (1) the father's emails were constitutionally unprotected conduct intended to harass, annoy or alarm the mother; (2) the injunction was narrowly drawn to proscribe the father's unprotected conduct; and (3) the best interests of the children were supported by the family court's limitation on the father's speech. *Id.* at 153.  Like the court in *Wedding*, we find the contents of The Book are solely aimed at disparaging, annoying, and ruining the reputation of Father.

We conclude the disparagement provision was narrowly tailored and the least restrictive means to protect the best interests of Minor Child.  The disparagement provision was even altered to protect certain forums for Mother's disparaging comments.  The record evidences years of contention and attempts at parental alienation by both parties.  The amended disparagement provision properly restricts the parties' unprotected speech so as to protect the best interests of Minor Child.  We find Mother's willful contempt of the Final Divorce Order provides further justification for the necessity of the disparagement provision and find no violation of her First Amendment right to free speech.

### D.    Attorney's Fees

Mother argues if this court reverses the finding of contempt, it should reverse the award of attorney's fees to Father and either award Mother her fees for defending this contempt petition or remand the matter back to the family court.  Based on our affirmance of the matter on the merits, we affirm the award of attorney's fees.

Based on the foregoing, the order of the family court is

**AFFIRMED.**[9]

**HEWITT and VINSON, JJ., concur.**

---

[9] We decide this case without oral argument pursuant to Rule 215, SCACR.